Jergensen and Gosch, 18-642 and 18-1118. Good morning, Your Honor. May it please the Court, my name is Christopher A. Mosh, and I'm here on behalf of Mr. Gosch. The issue I'll be handling this morning is the statute of limitations argument, Your Honor. I'm here with Mr. Egan, who represents Mr. Jergensen, and he'll be handling some of the sentencing issues. Your Honor, I think as we get into the statute of limitations discussion, I think it's important we keep track of the timeline in which these events occurred. The first event occurred on November 30, 2010, when the alleged victims Laurentian Group and the defendants entered into an agreement to create a joint account at Wells Fargo into which money would be deposited. On December 3, that money was deposited in the amount of $2.5 million, and there were conditions upon the withdrawal of that money, among them being that Laurentian, who deposited the money, had to be made aware of and consent to the distribution of that money for the purposes outlined in the memorandum of understanding. That money was deposited on December 3. Laurentian was not a signatory on that account. They were, Your Honor. It was a joint account, and they both were on the account and had access to the bank statements, and it was a joint account in that sense. There was an understanding that went into how that joint account was going to be governed and how the money could be dispersed from that account. The first withdrawal of that account takes place on December 8, 2010, where the defendants transferred $62,500 out of the account without Laurentian's consent, without its knowledge, for purposes outside the memorandum of understanding. They then undergo a series of withdrawals, and the final withdrawal takes place on March 8. March 8, Your Honor, according to the indictment, the last amount of the money is transferred after $500. 2011. I'm sorry? March 8, 2011. March 8, 2011. Yes, Your Honor. On March 23, Laurentian gets hold of the bank statements to which they had not been previously made aware. The government, in its indictment and in the trial, went out of its way to say that Mr. Ghosh and Mr. Juergensen prevented Laurentian from getting copies of those bank statements in order to prevent them from uncovering and discovering the fact that the money was being taken out impermissibly and fraudulently. On March 23, they discover it, and Laurentian contacts Mr. Juergensen and asks him about it, and he then lies to them about where the money is. They know the money is gone. They see that they haven't agreed to it. They haven't consented to it, and they ask him where it is, and then he then, after the cat is out of the bag, covers up where the money is. He then tells them lies about what has happened to it and what is done to it. On March 24, the Laurentian board convenes a board meeting to discuss what they're going to do, and George Wazingo, who was the CFO of Laurentian at the time, testified that they recognized that they had been the victim of crime, but they made the following decision, and this is what he testified to. If we pursued criminal charges, the judgment that some of us had is that it would make it very, very difficult to continue to finance the project, that we still needed to raise money, that if there was a taint of fraud on this, this would kill the project for good. So we waited as long as we felt it was reasonable until the end of August of 2014. So on March 24, 2011, Laurentian knew that they had been the victim of fraud, knew that they could have called the FBI and decided not to because they still hoped they would be able to pull off financing the project. And because they were told additional lies about where the money was and what the state of it was. That's correct. Now, there's no dispute that Mr. Juergensen lied about what he had done with the money that he was not supposed to take, and Mr. Ghosh as well. There's no doubt about that. The question becomes, though, do those post-discovery lies, those post-apprehension lies, extend the life of the current conspiracy? Well, the conspiracy is not simply to take the money and run, right? In other words, if somebody gets my credit card and goes to town, as soon as I'm aware of the fact that they're going to town on my credit card, that's the end of it. But this was a scheme to take the money, delay disclosure of that fact, and prolong the use of that money so they could eventually repay it. That was the goal, right? I don't think that's the goal, Your Honor. The goal of the conspiracy I was charged with, the purpose of it, was to steal the money and conceal the theft. That's what the alleged conspiracy is, the purpose of the conspiracy. The concealment ended when they looked at the bank statements and realized all the money was gone. Like, they are now aware that the They were told the money was someplace safe, right? That is correct. But Grunewald And that it would be, they'd be getting it back. That is correct. And Grunewald says that doesn't matter. Grunewald says that any statements made after the main objective of the conspiracy have been accomplished. That's the point. Whether the main objective of the conspiracy is to take the money and run, or the main objective of the conspiracy is to take the money and delay disclosure so that you can achieve some other objective. I'm sorry, my time is almost up. The purpose of the conspiracy, the theft occurred, Your to explain away what they did with it. But they're not charged with theft. They're charged with fraud. Conspiracy to commit fraud. They're not charged with active fraud. They're actually, they were not charged with a single count of active fraud, not a single one. They were charged with a conspiracy. Right, but you're saying this thing ended once it was moved without permission to another account. No, that's actually not what I'm saying. I'm saying the conspiracy ended when they discovered that it had been moved. The conspiracy ended once the victim becomes aware that they have been the victim of a fraud. And they actively decide not to contact the FBI, knowing they are the victim of fraud. But they think it's one fraud and not the actual fraud, right? They realize that they have been the victim of fraud because the money is gone and they didn't agree to it. So they know they've been the victim of fraud. And what Grunewald says — Wait a minute. I'm sorry? They don't necessarily know they have been the victims of fraud. You argue that, but they know they have been the victims of moving the money without authorization according to what they had agreed to do it. But that doesn't necessarily mean that they've been defrauded as opposed to having the money put, as they were told, in a safe place, satisfactory to the lender, and that they would continue to pursue the hope of getting the loan. But that's actually not what the testimony was about. What the testimony was, is they knew they had been the victim of fraud. And George Wiesengel, who is the CFO of Laurentian, testified, if we pursued criminal charges, the judgment that some of us had is that it would make it very, very difficult to finance the project. And so we waited as long as we felt was reasonable. It's not that they have the hope, that they have the hope that they're still getting the loan, which they don't want to clear that. They know they're the victim of fraud. They just hope they're going to get the money back. There's no dispute that they know they have been the victim of the fraud. What they are trying to figure out a way is if we hold on long enough, maybe they can put the money back. They've been induced to not go to the authorities in the hope that they'll get the money back based on representations, false ones, made by your client, right? They were not induced at all because this decision was one that they made on their own. But they made it on their own based in part on statements that the money was safe. If I break into somebody's house and steal a watch and they know that I've stolen it and I say, don't worry, I'll give it back later, don't go to the police. It's not a theft case. And you keep making that point. But it's not a theft case. It's a fraud case. It's a conspiracy to commit fraud. Which involves false statements that are designed to defraud somebody of something of value. There's no doubt about that, Your Honor. But the conspiracy is what they're charged with. They're not charged with an underlying substantive count. In the case of the theft from the home, the crime is completed when the person takes the stuff out of the home. It doesn't depend in any way on how the victim of the crime views it or whether he knows or doesn't know. The person might never know, but still the crime was completed when somebody went into the home and stole the object. I agree. And in this case, Your Honor, the It's different from this case. It's actually not, in my humble opinion, Your Honor, because in this case the fraud was completed when all the money was taken. And when Laurentian discovered that the money was gone. That's when the crime is complete. Any statements after that are a separate conspiracy to conceal the fact that they have stolen the money. The government could have charged a separate conspiracy, which is what Grunewald says you should do. There was no statement made after, before the money was gone that kept Laurentian from going to the police. You made those arguments to the jury. I was not the trial counsel, Your Honor. No, you didn't. The government made the argument. What they did, they filed a pre-trial motion looking to dismiss, kind of take it in based on the violation of the statute of limitations. The government, the judge said it's premature. Let's wait and see how it comes out at trial. They then renewed the motion. So they did argue to the jury, and that, and as Mr. Wisingle testified, that this was a considered business decision by Laurentian not to go to the FBI. That they looked, talked to their advisors, talked to their financial people, and realized that if they had gone to the FBI like they knew they could have, it was going to get in the way of their deal. So they were not lulled into not going to the FBI because they didn't realize that they had been a victim of a crime. They knew they had been a victim of a crime. They decided not to go because they thought it was in their best interest not to. And they ultimately decided, well, my interest is now up. August 2014, they go. And to your point, Your Honor, they'd still, it wasn't like in August of 2014, they suddenly discovered where the money was. Oh, my goodness, I'm never getting it back. They knew that the money had been used to spend, to pay expenses for your client? They never, they didn't. As far as I can tell from the record, Your Honor, they never knew what happened to the money. All they knew was that it was out of the account that they thought it ought to be in. All they knew was that it was spent for reasons that they didn't authorize. That it was spent? Well, that money was gone. It was gone. That it was gone out of the account. It was moved. Let's not say gone. It was never, nobody told them it was gone. They just told them it had moved. No, they know that it was gone because it wasn't in the account into which it was deposited. It had been gone from the account. From the account, right. All right, but that's not the same as gone or spent or stolen. Your Honor, if I take money and you don't know where it is, does that mean I haven't stolen it? I think it means I've still stolen it. You just don't know where it is. But I'm not allowed to have it. It's not my money. I took it without your authorization.  So if my bank tells me that they moved $1,000 from my checking account into a different account, they're sorry about it, they'll move it back, but don't worry, it's safe, and they've actually spent the money, I know when I learn they've moved it out of my checking account and that's the end. That, Your Honor, is an example I really want to kind of dwell on because the lulling. You don't have much time. I'm sorry. But I'm trying to answer the question because the lulling doctrine is to keep you from apprehending that you have been the victim at all. And, again, they knew they had been the victim of the money moving out of the account. That's breach of contract. That's breach of contract. But they described it as saying we knew we could go to the FBI, we knew we had a criminal charge on our hands, we also know that a criminal investigation would get in the way of our long-term goal of financing this project. So it wasn't as if they were unaware that they were the victim of a crime. They knew they were the victim of a crime. They testified to it at trial. They just decided amongst themselves that if we do this, this is going to get in the way of our larger goal of trying to finance this project. And once they decided that, you know what, this project is never going to get financed, this project is dead, they went to the FBI in August of 2014. Nothing had changed between the time they discovered the money. I understand that you also challenged the jury instructions on lulling communications, but this is all before the jury, correct? It is, Your Honor, but it's not a fact question for the jury. No, I understand. Okay, so it was before the jury, but it should never have gone to the jury, because the evidence, I mean, it's uncontroverted that the statement that Mr. Juergensen made about don't worry, your money is safe or it's with the lender or whatever it is he specifically said came after Laurentian had discovered the money was gone. It wasn't in furtherance of the fraud. The fraud had already taken place. The concealment dealt with let's make sure Laurentian doesn't find out the money is gone, which is why the government, I'm sorry, Your Honor. So we have the benefit of your argument. You've reserved three minutes for rebuttal. We'll hear from Mr. Egan. Thank you, Your Honor. Thank you. Good morning. May it please the Court, James Egan for Defendant Appellant Keith Eric Juergensen. As Counsel for Mr. Ghosh indicated, I will be addressing the sentencing issues today. I'd like to focus primarily on the district court's application of the abusive position of trust adjustment sentencing guideline 3B1.3. As we've indicated in our briefs, the district court erred because neither Juergensen nor Ghosh nor anybody for the term verdant to apply to both defendants here had a position relative to or vis-a-vis Laurentian. Verdant was merely a party to a contract that was negotiated at arm's length. And the district court erred. I understand that position. I also understand our law about how we are to assess whether someone, a defendant, has a position of trust, but your, well, Mr. Jergensen, on cross-examination, said, I am a fiduciary. Is that correct? Yes. He did say that, yes. What are we to make of that? Not much. I mean, not much. One thing. We've said, you're a fiduciary, more or less. Right. That will qualify as a position of trust. I don't think, you know, with all due respect to Mr. Jergensen, his opinion is not of any consequence right here, because you know. I don't think it's at all relevant. No. He viewed himself as a fiduciary, and so maybe Laurentian and others may have viewed him as a fiduciary. I think what Mr. Jergensen was probably referring to is sort of the ordinary understanding of abuse of trust. This requires a position. So in ordinary parlance, perhaps he had some – he took it upon himself and was – Right. That's fine. But that doesn't matter for purposes of the adjustment, because he has to have a position. Wait, wait. What is his position? He has to have a position? Yeah. He has to have a relationship that would be one of trust, right? No. He has to have – the guideline uses the term position, and it talks about position in terms of substantial discretionary judgment that's ordinarily given to that position. So we're talking about a position. This court in Jolly – But we've said understanding that there's language in the guidelines, we've referred to a fiduciary or fiduciary-like relationship. That's right. There's language in this Court's decision to talk about that. But, again, the question is viewed in terms of the victim's or the alleged victim's perspective, not from the defendant's understanding at trial and his attempts to whatever he's trying to do at that point. From the victim's perspective, Verdant had no discretion whatsoever, none. They couldn't move the money without Laurentian's signature. It was in a joint account. They were supposed to give bank statements. Nothing was given to Verdant. Was there a signature from Laurentian, a signature? I mean, there may have been a signature requirement, but did anybody ever sign a card for that account from Laurentian? The testimony – No one from Laurentian, notwithstanding the agreement, had actually signed the card. Maybe that's Laurentian's problem, but I wonder if you could answer that question. So big picture, the record on the question is murky. But Laurentian – the three witnesses that testify for Laurentian, Juan Sigel, the President, and Andy Edwards, both talked about how they believed that Rob and Juan Sigel signed in November 16th or whatever. But it was – through other record evidence, it was established that Juergensen was not present at that meeting. And it's not clear whether the – whether Rob and Juan Sigel signed the form and it just wasn't submitted, or if it was submitted for a different account, or if the bank mixed it up. It's not entirely clear why the joint account was not established, pursuant to the memorandum, understanding that Laurentian would be a dual signatory to the account. All we know is that at some point, Verdant, through Juergensen and Ghosh, became aware of the fact that Laurentian was not a signatory and, therefore, moved the money without Laurentian's knowledge and without their signature. So – but, again, the question about whether Laurentian was a signatory is not really – doesn't get us very far in the analysis. I mean, it's not as though Juergensen or anybody at Verdant was holding themselves up as a bank that would – this isn't a business of establishing joint accounts. Verdant just took it upon themselves to do a favor or – as a matter of convenience to submit paperwork to the bank, a two-page document that Laurentian was supposed to sign and perhaps did sign, and submit that paperwork to the bank. That's not really – there's no position there. I mean, this is a courtesy. And there's no discretion. I mean, it's not a very – it's not a difficult crime, if it is one, to detect because, after all, Laurentian is a party to the joint account. They could call the bank at any point. Is it possible – is it possible under the abusive trust guideline to have a situation where an initially relationship that is not a fiduciary relationship or not a position of trust transforms into a position of trust based on a change of circumstances? I suppose hypothetically, perhaps. Why can't we look at it, this case, in that way? That is that it started out with an arm's-length transaction between two relatively sophisticated parties. We could quibble about that. And then was transformed over time because of the lack of the signature and so on and because of their total control at some level over this account into a more or less a position of trust or a fiduciary-like relationship. But, Your Honor, this was just a garden – this was just a garden in which one party breached a contract, took advantage of that, and, for their own benefit, were to access money, property, something of value that they were not entitled to. The fact that Jurgensen took it upon himself to do that was not something that was given to him by Laurentian. Everything goes back to what is Laurentian, the alleged victim here, what is their understanding? What have they conferred? They have conferred nothing. And, therefore, the district court's sentence should be vacated and remanded for resentencing. Thank you very much. We'll hear from the government. Thank you. And, Mr. Egan, you've also reserved some time. Good morning, Your Honors, and may it please the Court. My name is Michael Barnett. I'm an assistant United States attorney from the Northern District of New York, and I also conducted the government's trial before Judge Sanis. Your Honor, the issue of statute of limitations was argued extensively to the jury from beginning to end and culminated not only in a guilty verdict, but the jury's answer of yes to a special interrogatory question on the verdict form as to whether the government had proved a conspiracy that extended into the limitations period. The defendant's burden is a heavy one. They have to show that no rational jury would have found what this jury found. They are making a sufficiency argument. And in making their sufficiency argument, Your Honors, they understate, minimize, and really ignore the breadth and depth of the evidence that was presented at trial, and I just want to give one example of that. The jury heard extensive testimony from husband and wife, Barbara Guibert and Jerry Holmesy. They were partners in the Verdant Company with the defendants, and they testified about how they too were kept in the dark, repeatedly lied to all throughout 2011 and 2012 regarding what Verdant had done with Laurentian's money and other people's money to the point where they had to hire their own attorney, spending between $50,000 and $100,000, and threatened to sue their own company before they received financial information, including what happened to Laurentian's money, and that did not happen until September 2012, of course well into the limitations period. Yes, the question is how do we distinguish, and I think we've got some case law on this but maybe you can help us, between communications that are designed to conceal and those that are designed to prolong the objectives of the conspiracy. Well, this Court's precedent, as well as Grunewald, ask essentially first what is the conspiracy, what has the government alleged, what has the government proved, and then asking whether specific acts or series of acts are in furtherance of that central object of the conspiracy or whether they come after the conspiracy has ended. And we can, of course, imagine scenarios, Your Honor, in which acts are taken that might even benefit a conspiracy that are nonetheless not part of that conspiracy and would not extend the limitations. An example might be a group of people get together, decide to rob a bank. They go their separate ways, split up the money. Six months later, one of the bank robbers burns the clothes that he wore during the robbery out in his backyard. That may benefit the conspiracy, but if the conspiracy ended six months ago … Your adversary says that they robbed the bank when they took the money out. Well, Your Honor, and that's argued at length at trial before the jury, and there's extensive briefing on this in this Court and in the Court below. In 2000, really, Laurentian never learned that its money had been stolen, spent. It had been told only that its money had been transferred. There's a huge difference there. And the lies are important because, yes, they had been told … So do you agree, then, that if Laurentian, if the evidence was that Laurentian had been told that the money was stolen, the subsequent communications would not have extended or prolonged the period of the conspiracy? Well, Your Honor, if Laurentian had been told their money had been stolen, there would be no need for those subsequent communications because the whole point of those subsequent communications … Well, he's saying that they made a business decision, maybe, to not go to the FBI. So, Your Honor, I think we have to take that into two time periods. Between March of 2011 and really through the end of 2012, Laurentian was completely in the dark that its money was stolen. They had been told only that its money had been transferred to another account at the same bank. I'm sorry. What date did you give as the end date? End of 2012, so well into the limitations period, Judge LaValle. They had been told only that their money had been transferred to another part of the bank. And the lie here is really important. They didn't just say the money had been transferred. They said it had been transferred in furtherance of our desire to help you fund this great project in Plattsburgh, New York. That's the reason we transferred the money. They didn't say we transferred the money so you would never see it again. They said we transferred the money in furtherance of the project. You. Exactly. And in November of 2012 was when Griebert and Holmesy, who are now knowledgeable about what happened because they hired a lawyer and got the documents pursuant to Delaware law, they find out what happened. They resign. And as they resign, they write a letter to Laurentian saying, by the way, we think your money has been stolen. So at that point, it's fair to say Laurentian has knowledge that their money has been stolen. We're well into the limitations period. And, yes, between that point and March of 2015, they made a business decision not to immediately go to the authorities. And that's in the record, not contested. Their first report to the FBI actually wasn't in August of 2014. It was March of 2015. So but the key is what they knew in 11 and 12 because as long as we show that the conspiracy continued past July 28, 2011, as the jury found, we prevail and the jury and the court below should be affirmed. And, Your Honor, this case is entirely on all fours with this court's decision in Rogers from 1993 involving telexes that were sent following the fraudulent exhaustion of a line of credit, as well as this court's decision in 2015 in Ritigliano, a Long Island Railroad case. I mean, Rogers doesn't say all that much, but you're saying it says enough. Absolutely, Your Honor. And it does cite to Grunewald and it does stand for the principle, at this point, firmly established that a conspiracy can include, in some instances, a case-by-case analysis, but it can include post-theft communications designed to prevent the victims from finding out what happened. And, again, I think a case-by-case analysis is very important because, in this case, as Judge Sullivan said, it's not take the money and run. It's take the money, stick around, hope to replace it, and also hope to finance the project. And that is, in fact, what they did with another victim whose situation was presented at trial. They were called the Errors Group. And, in fact, that's exactly what they did to Errors Group. They solicited initial equity investment of $380,000, immediately stole it and spent it. Like a Ponzi scheme. Exactly. Exactly. What do we make of the fact that the purpose of the indictment, the purpose of the conspiracy, as alleged in the indictment is, says the purpose of the conspiracy, paragraph 10, was to steal Company A's $2.5 million and then conceal the theft from Company A? Well, that is what we alleged and what we proved at trial. We also said, Your Honor, in paragraph 9, that they misrepresented, and I'm here paraphrasing, misrepresented, concealed, disguised, and failed to disclose material information about the location, safekeeping, and use of the money. That's A23 of indictment, paragraph 9. So the indictment lays out what the government intends to prove at trial, gives very fair notice of what we intend to prove, and, of course, in keeping with this Court's precedent in a case called Rutkowski, we can go beyond the indictment in terms of proof at trial so long as we're consistent with the indictment. And there's no argument here that there's any kind of variance or departure from what's in the indictment. Yes, the purpose of the conspiracy was to steal the money and conceal the theft, and we showed at trial that the motive for concealing the theft was to eventually replace the money. And actually, they wanted to fund the project. And they actually say in their sentencing argument to this Court that they always wanted to return the money. Well, if they always wanted to return the money, then how was there not a conspiracy to do that following the theft? And the jury could conclude, as we showed at trial, that this was a single conspiracy to steal and conceal at the outset. Your Honor, I did not hear anything on what we call the third issue in our brief, which is the expert testimony issue. I did want to note briefly that that was a situation where Juergensen wanted to present the testimony of a law professor who he was allowed to testify as to some general aspects of things, but he wanted the law professor. Things being advanced fee schemes. Yes, prime bank and advanced fee schemes, yes, Your Honor. But he wanted the expert to go farther and explain who in those schemes is innocent, who's guilty, and why these schemes can ensnare smart religious people such as Juergensen. And the Court drew the correct line in this case under 704B of the rules of evidence. It correctly concluded that that was really an attempt to get an expert to opine as to the defendant's state of mind, which 704B expressly precludes. We also made a 403 argument, really also a 401 argument, pointing out that this would be hopelessly confusing to the jury because the expert, a law professor, would be brought in to opine on a fraudulent scheme that was not even charged in the conspiracy and opine on fraudulent intent in some other scheme that, as we contended, had no bearing on the scheme actually charged. And our position, I just want to be clear, is not that a law professor can never come in and testify. Certainly there's lots of good uses to which law professors could be put. What might those be? Well, as an example, on a complex security and tax case. Go ahead and answer that question. Okay. So in terms of moving to what we call the fourth issue, which is sentencing, Your Honor. I want to ask you about that. What about the issue of public or private trust? The application note, well, the guideline says if the defendant abused a position of public or private trust. And then the application note, number one, refers to definition of public or private trust. And it says public or private trust refers to a position of public or private trust characterized by professional or managerial discretion, i.e., substantial discretionary judgment that is ordinarily given considerable deference. So it seems to me that the intention of this definition in the application note is to distinguish between someone who is given substantial deference with respect, like a trustee or somebody like that, not limited to a trustee, and, for example, an extreme example on the other side, someone who is given a clearly defined task without a lot of discretion. For example, if you say to someone, take this suitcase full of money or envelope full of money and take it and deposit it in the bank, the person in the latter situation is given the opportunity to do something inconsistent with the charge, but is not given discretion. Is simply told, take this envelope full of money and deposit it in the bank, or do whatever the instructions say. So the defendants are arguing, and how valid the argument is is another question, but they're saying that if they were not given discretion, they simply don't come within this guideline, which is not just a general discretion, but it uses, it opens with the word definition, and then it says, i.e., in other words, substantial discretionary judgment. What was their substantial discretionary judgment? Well, Your Honor, these defendants were in a fiduciary or quasi-fiduciary position. They were given discretionary judgment as to exactly how the account should be opened, meaning there were specific instructions on opening the account, but they were entrusted with making sure the account was actually opened, and it wasn't. They were also entrusted with sending money. It wasn't opened? It wasn't opened in accordance with the instructions. So, Judge ---- The issue is, I mean, if the instructions were specific, I mean, you're saying the fact that they violated the instructions means that they had discretion, but it seems to me to mean the opposite. If the instructions were specific, it's not that they were left with a portfolio of discretion as to how you set it up. They were told exactly how it should be set up, and you say they violated that, like somebody who's told take this money to Garcia, and instead of doing that, the person takes the money elsewhere. Well, it was a mix, Your Honor. There were certain instructions about how to open the account, and to answer Judge Loyer's question, initially there were no Laurentian members on the account. That only happened according to trial testimony as of May of 2011, meaning after the money had left the account. But here it's certainly a mix, Your Honor. There were ---- What discretion was given to them? What was the discretion that they were essentially told, you are free to exercise your discretion as to the following issues, and tell me what some of those are? Well, for instance, providing account statements. They were supposed to provide account statements every month, but ---- So to the agreement. Right. Agreed, but there ---- The reason that this is a close call or a difficult issue is usually in the context of an agreement, the fact that an agreement is breached doesn't tell us that that's as a result of discretion. It's just a breach of the agreement, and you've described only things that reflect a breach of the understanding between the parties. Well, but I think it's often the case that fiduciaries and quasi-fiduciaries have detailed instructions. I'm sure we could think of lots of examples in the attorney context in which ---- I'm getting concerned about my bank now because I have an agreement. They're not ---- I mean, there's a checking account and a savings account. They're not allowed to do whatever they want with it, but apparently if they do, there's no abuse of a position of trust. Well, and this whole case, Judge Sullivan, was about abuse of trust. They, foolishly or not, trusted them to do certain things, such as to open the account to make sure the correct signatories were on it and to provide monthly account statements. So I agree, Your Honor, there are instructions in this case, but in terms of the bigger picture, what is a fiduciary ---- Asking somebody to do what you tell them to do is a different thing from giving them discretion to decide how to go about accomplishing some ultimate goal. But I think they did have some discretion, although there were some instructions and I ---- So that's what I keep asking. Right. Well, there ---- What was the discretion that they had as opposed to the opportunity not to do what they were told to do, which they had plenty of opportunity not to do what they were told to do? But what did they have the opportunity to ---- What were they given the discretion to decide whether to do it this way, whether to do it that way, whether to do it some other way, all of which came within the proper performance of their assigned goal? Well, and I'm going to answer your question by also pointing out that something this case did turn into one in which they all of a sudden had a lot more discretion in the sense that the account wasn't open as specified. They knew that because they were transferring the money. And that's why Juergensen testifies, and this is important, that he was a fiduciary. By the way, we established through cross-examination that he was also the fiduciary  So when he says, I'm a fiduciary, he knows of what he speaks. And so, Your Honor, I believe the situation morphed into one in which they did have a lot of trust, and they knew it. And Laurentian, after the theft, was trusting these gentlemen to tell them the truth about what happened, and they kept lying. There was ---- But what you're really saying is that the relationship transformed from one where there was a discrete set of instructions, where they had relatively little control over the account, to one where they had, to borrow a phrase from another area of securities fraud, total domination and control over that account. Correct. And they were ---- Yes. And total control and domination of the whole project, because they were essentially holding Laurentian hostage. They said, you know, don't report this to the authorities. It will jeopardize the project. They said, trust us. It's with the lender. Please don't contact the lender. We can't tell you who the lender is. There's a whole series of instances in which even post-theft, there was continuing abuse of trust. And I cite this Court to its decision in United States v. Allen, 201F3163, cited in our brief and also by Judge Sanis, which covers, Your Honor, this situation in which a victim's negligent entrustment of the defendant still can ---- A victim's negligent entrustment of a defendant who is supposed to be pursuing specific things and following specific instructions ---- You're saying that they had, in any event, they had considerable discretion as to how to advance Laurentian's interests via the lender. Absolutely, Your Honor. Even if they weren't given a lot of discretion as to what to do with the 2,002,005 that were given to them, they were given a lot of discretion as to what to say to the lender to advance Laurentian's interests. Absolutely, Your Honor. That is certainly one of our arguments. And I see my time is running out. I would, with the Court's indulgence, like to address briefly Issue 5, asset forfeiture. Yes. So I didn't hear it addressed by my colleagues. Is the asset forfeiture a joint and several forfeiture? That's exactly what I wanted to address, because in our brief we suggest it may not be. But, in fact, we agree with the defendants that it is. In our indictment, we sought a joint and several liability for the asset forfeiture. It says that right in our indictment. It does not say that in the preliminary order of forfeiture we drafted. In the judgment, it seems to. It suggests that. It suggests it, and we drafted it. So it's certainly a little bit on us. The restitution certainly says joint and several. That's what Judge Sanis said. But I don't see any way to treat this as anything other than joint and several. And that's really the point, which is, assuming that Honeycutt applies to a fraudulent scheme, an asset forfeiture arising out of it, this is consistent with Honeycutt in that the defendants, as they stipulated to, as was proven at trial, always had joint possession and control of the $2.5 million. So to make them jointly and severally liable in this context is entirely proper. They both acquired or had the $2.5 million. Exactly, Your Honor. Thank you for your time. We otherwise rest on our brief. Thank you. Good morning, Your Honor. Thank you again, Christopher Amolscher and Mr. Gosch. Judge LaValle, I'd like to talk briefly about your question to the government, where you asked about the indictment as it relates to concealment. Grunewald specifically goes exactly to this question that you just asked. Grunewald says the vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives and for the purpose only of covering up the crime. And Grunewald says that this distinction is true even if concealment is explicitly charged in the indictment. So the fact that the government charged concealment with the indictment, and that's Grunewald at 401, even though it's explicitly charged in the indictment, that does not change this charge from one of concealment after the fact, after it's been apprehended, to your question specifically. So the concealment in the indictment is of no moment. Grunewald speaks specifically to that. As it relates to the Holmesian-Gwifford testimony that he related, the government talked about, those were members of the verdant of Mr. Gosch and Mr. Juergensen. They're of no moment. This is not about what they knew and when they knew it. This is about when the victims became aware that they'd been the victim of fraud. The testimony was incontrovertible. They had a board meeting the day after they received the bank statements, decided they'd been the victim of fraud, and decided not to call the FBI. That happened the day afterwards. As it relates to Rogers, incredible distinction must be made between this case and Rogers. In Rogers, the $2.5 or $2 million line of credit had been exhausted. But the bank did not know that the leases that the defendant was continuing to give to the bank to support that loan were false. Whereas in this case, it's incontrovertible that the victims knew the money was gone. So that's a huge distinction. In Rogers, the money was already gone. They continued to then forge and falsify leases to keep the bank from finding out that the loan was false and was fraudulent. That's not what happened here. These victims had perfect knowledge, the fact that the money was gone, and again, were aware that they'd been the victim of a crime. So Rogers actually stands precisely for what we're talking about, which is that statements done to keep the victim from apprehending that they'd been the victim of a crime can lull the statutes. But that's not what happened here. What happened here is they knew they'd been the victim of a crime. The statements came afterwards. Mr. Jurgensen's statements were done to conceal the fact and the purpose of covering up the crime, and the government made a statement about the fact that, well, if they really wanted to pay the money back, that would be a separate conspiracy. That is completely correct. That is completely correct. That is what the conspiracy should have been charged. There should have been two conspiracies here. The conspiracy to defraud the bank, I'm sorry, defraud Laurentian, and a conspiracy to cover up the crime afterwards. You're saying they had to charge two conspiracies. That's what Grunewald says you have to do. It doesn't say that. This conspiracy was designed to get them to turn over $2.5 million for your clients to be able to use that money for personal reasons and for business reasons, to then pay it back so that they would never know they were hit, and then to keep doing this with other clients. Your Honor, all due respect, they were never allowed to use it for personal reasons. They weren't allowed to. No, they weren't allowed to. That was never the rules. But they did. They absolutely did. They absolutely did. And Laurentian knew. You're conflating their contract with the conspiracy. No, the conspiracy is, in fact, this is not a breach of contract case. It's not. I agree. It is a fraud case. It's a fraud case. And the fraud is I lie to you about why I'm going to take your money. I take your money. I do something else with it. And then you discover it, and then you can prosecute me or not. Statements I make afterwards to make you feel better about the fact that I've stolen your money, and I'll give it back to you, and I used it for another purpose, and I'm really trying to secure a loan are not part of the charged conspiracy, even if concealment is charged in the indictment. The concealment goes to you uncovering the nature of the crime in the first instance. Any concealment done after that is covering up the crime, which is what they did. I don't find that terribly persuasive, because if the concealment is in the nature that it gives you the hope of getting away with the conversion of the $2.5 million, I mean, stealing the $2.5 million is of limited value if the minute you've taken the money out of the account, the whistle is blown and the law enforcement comes down on you and so forth, much better is to arrange things so that the people who put up the $2.5 million that you little by little take out of the account are duped into thinking that they've still got their deal going, and they delay and delay and delay, and perhaps in the end you get away with it without ever having the whistle blown or getting caught or having to give the money back or any bad consequences. And that seems to me to be the nature of the continuation of this conspiracy, that they were lulling the victims of the crime into trying to get them into the belief that nothing bad had happened and everything was going to come out all right. And the longer they extend this, the greater the chance they have of ultimately getting away with the whole thing. Your Honor, I agree with almost everything you said. That's exactly what Gruenwald says. And the concealment in this case was keeping Laurentian from getting the bank statements to know the money had been taken out. The government went to great lengths at trial to talk about the fact that they never got the bank statements, that Juergensen and Ghosh were supposed to send them the bank statements and they didn't, and they did it to keep them from finding out the money was gone, and that they didn't find out the money was gone until March 23rd and they're like, holy moly, Mr. Juergensen, our money's gone. And then once they know about it, they know they've been the victim of a crime. The concealment is then over. There's nothing else to hide. Breyer. What crime do they know that they're a victim of? The crime is the same crime that's charged? Well, it should be. The crime that was charged was conspiracy to take the money and the concealment. But the concealment, Your Honor, it's really important we understand. That's what Gruenwald says. The concealment deals with uncovering the conspiracy. It doesn't deal with post-concealment statements after the conspiracy has been uncovered. And that's what happened. And to say that they didn't know they were the victim of a crime is to ignore what George W. Zingel testified to, that we knew we were the victim of a crime, we decided not to go to the FBI, and we waited as long as we could to not go to the FBI to see if we could somehow still pull this off. And nothing happened in August of 2015 or March to change any of that, except they decided the deal wasn't going to happen. They didn't get any more new knowledge. The last thing I will leave, Your Honor, and I promise I will be done, and I appreciate the Court's contention, is what the judge actually said, is the judge's order basically read that she found that the conspiracy continued because the charged conspiracy included actions the defendant took to lull Laurentian and board members into believing the money was safe. That is classic concealment of the crime after it has already taken place. If not immediately available. And that it would be returned, classic covering your tracks, concealment after the conspiracy has been uncovered. Furthering defendant's objective of preventing Laurentian from ending the financial deal and demanding the return of the money. The last thing I will leave, Your Honors, with is they did demand the return of the money. They demanded the return of the money a month later, and they demanded that Gauche and Jurgensen execute personal guarantees. So they did demand it back. Thank you. The indictment in paragraph 9 doesn't say conspired to steal the 2.5 million, although it does say that in paragraph 10. But what it says in paragraph 9 is conspired to commit a wire fraud. And conspiring to commit a wire fraud with respect to the facts of this case is broader than simply conspiracy to take $2.5 million. It's to conceal the fact that they took the $2.5 million. That's the charge. And how they took it and what they did with it. No, there's nothing in there about the government. That's not an element of wire fraud. The government has to prove what you did with the money. It's not an element of it. They don't have to prove that. Well, it's a material fact that would have had an impact on the victim, right? But the victim knew. No, no. The victim knew the money went from one place to another. The victim didn't know what the actual state of the money was. That's true, Your Honor. But because they didn't know what the actual state of the money was, doesn't change the fact that they testified we knew we had been the victim of a crime and we could go to the FBI and didn't. The fact that they didn't know where it was doesn't change the fact that they knew they were the victim of a crime. Otherwise, if you have to know what happened to the money, the statute of limitations goes forever. If you have to – if that's an element. We've kept you well past your time. Thank you. Thank you, Your Honor. I appreciate it. Mr. Egan. Are we done, Your Honor? I'm sorry. Hello again. Focus again on – Hello again. Hello again, again. I'd focus again on the abuse of position of trust. The government was – it seems to me it appeared a bit strange to find an example of something that – some discretion that was conferred. And relied on Jurgensen's, again, his testimony, his straight comment that he was a fiduciary. And again, I would submit that his understanding, whatever that was, is not the basis for the application. It's an objective test, obviously. But your client was an officer of verdant, right? Yes. Okay. And so as an officer of verdant was expected to conduct himself in a particular way. That's correct. By holding himself out as an officer of verdant, that is what created the relationship with the defendants, right? Correct. I would point the court, though, to a case called Broderson from the circuit. Cited too by Jolly, in which the defendant was the vice president of the company. I believe it was a contractor that had secured funds from the government and was required by law to disclose certain information to the government about the loan money. And there it was found that his role as the vice president was not sufficient to apply the abusive position of trust adjustment. Well, his own partners, his own colleagues at the firm, thought he abused a position of trust at the firm, right? They resigned. They blew the whistle on him. But they're not the victims of the alleged victims, anyway. They may be tangentially related somehow, but they are not. Oh, they're not tangentially related. If your client had just been a guy in a street corner, nobody was going to give him $2.5 million. He was given $2.5 million because he was an officer of verdant. But that's the case of any contracting parties. They both contract at arm's length in one, trust in ordinary parlance. The position of trust within verdant is that he's going to do certain things with money that's been entrusted to the firm. But not vis-à-vis verdant, not vis-à-vis verdant's overall structure. I mean, whatever trust he had was vis-à-vis Laurentian, and Laurentian strictly confined that, gave them no discretion. And that ultimately is a reason. But then a bank officer will never, a loan officer will never be on the hook for a two-point enhancement for abusive position of trust because the person, the borrower is going to be assuming that the contract is what governs the loan officer's conduct, right? Well, I mean, that's a bit of a different. Are you saying that the loan officer vis-à-vis the bank has abused some trust within the structure of the bank? Or are you talking about the – That's the point, right, that a person who is an officer of a bank or an officer of verdant, who is getting access to this money only by virtue of that relationship, abuses that position of trust when he takes it. But not vis-à-vis the victim and the victim's control. That's your answer, then, that a bank officer would never be assessed an enhancement where there's a victim, not the bank. Can you flesh that out a little bit more? Are you talking about the bank officer securing a loan for the customer from the bank's assets? Well, I don't want to string this out indefinitely. Just my answer is there's no – Laurentian didn't confer any discretion, and that's the question. Viewed from the perspective of the alleged victim, was any discretion conferred? And the answer is no. Would you agree, Mr. Egan, though, just to follow up, that there may be some situations where an agreement, there's an agreement between two counterparties, and thereafter, for a number of different reasons, the relationship is such that one of the counterparties exerts total domination and control over an account, and that that might be one of the transforms from a just, you know, arms-length transaction into a fiduciary or trust position? Would you agree with that? Well, that's Judge LaValle's example, right, the guy that takes the envelope of cash and converts it to his own use. Would you agree with that? I would not agree with that. You're not agree. So a lawyer who is told, put this million dollars in escrow, that's the deal, no discretion, and he walks off with it, that's not an abusive position of trust. That's because a lawyer has a position of trust that is ordinarily given substantial discretion. That's the point, that he's a position. But not in this case. Just put it in escrow is not discretionary. But there again, the lawyer has a position that society views as bearing or containing or whatever, some substantial discretion. And the victim, the client, always goes to the lawyer, thinking that the lawyer is acting on his best interest by virtue of that position. That's not the case of the guy who takes an envelope of cash and uses it to his control. There's no conversion. The victim doesn't say, oh, you took my cash, okay, I'm going to now confer discretion and you can spend it how you'd like as long as you give it back to me in five years. Thank you very much. Thank you. We'll reserve the decision.